1

2

3

4 UNITED STATES DISTRICT COURT

5 NORTHERN DISTRICT OF CALIFORNIA

6

7 JUDITH S. SHAPER, et al.,                        Case No. 21-cv-00493-EMC

8                          Plaintiffs,

9            v.                                   **ORDER GRANTING IN PART
                                                  DEFENDANTS' MOTION TO DISMISS**
10 ROBERT A. ZADEK, et al.,
                                                  Docket No. 32
11                        Defendants.

12

13

14           Plaintiffs are Judith S. Shaper and the Judith S. Shaper Living Trust ("Shaper Trust").

15 They have sued Robert A. Zadek and two affiliated companies, L.O. Annie, Inc. and Lenders

16 Funding LLC.  Defendants solicited Plaintiffs to give loans in the form of Promissory Notes, and

17 Plaintiffs gave such loans, totaling about $4 million.  Plaintiffs allege that the Promissory Notes

18 constitute securities under both federal and state law and that Defendants sold these securities

19 without being registered to do so, as required by federal and state law.  Plaintiffs also charge

20 Defendants with making material misrepresentations and/or omitting material facts in connection

21 with the sale of the securities.  Plaintiffs have asserted various causes of action in the operative

22 second amended complaint ("SAC"), including claims for violation of federal and state securities

23 law and state tort claims.  Currently pending before the Court is Defendants' motion to dismiss the

24 SAC.

25           Having considered the parties' briefs and accompanying submissions (including the

26 supplemental briefing filed post-hearing), as well as the oral argument of counsel, the Court

27 hereby **GRANTS** in part the motion to dismiss.  Specifically, the federal securities claims are

28 hereby dismissed with prejudice.  The Court declines to exercise supplemental jurisdiction over

United States District Court
Northern District of California

the remaining state law claims.

## I.      FACTUAL & PROCEDURAL BACKGROUND

In the operative SAC, Plaintiffs allege as follows.

Mr. Zadek is a CPA and a lawyer at the Buchalter law firm.  *See* SAC ¶¶ 7, 41.  He is also the president and sole shareholder of L.O. Annie (a corporation).  L.O. Annie, in turn, is the managing member of Lenders Funding (a LLC).  *See* SAC ¶¶ 7-8.

Lenders Funding is a company that loans money to third parties.  On its website, Lenders Funding states that, "'since formation, we have worked with over 150 lenders and factors and have supplied several hundred million dollars in funding.'"  SAC ¶ 24 (emphasis omitted).  According to Plaintiffs, Lenders Funding gets the money to loan to third parties by selling Promissory Notes.  Lenders Funding has sold "hundreds of millions of dollars of . . . Promissory Notes to hundreds of investors (primarily but not exclusively domiciled in the State of California) for over a decade."  SAC ¶ 24.  *See, e.g.*, SAC ¶ 54 (alleging that Lenders Funding "raised $5,000,000 via the issuance of Promissory Notes (like those sold to the Plaintiffs), then loaned those funds to third party Cash4Cases, Inc.").

Mr. Zadek and Ms. Shaper were once married but divorced.  *See* SAC ¶ 42.  From April 2009 through December 2019 (apparently, all after the divorce), Mr. Zadek solicited Plaintiffs to invest in a number of Promissory Notes.  *See* SAC ¶ 43 & Ex. G (Promissory Notes and/or Amendments thereto).  Plaintiffs invested about $4 million in Promissory Notes.  *See* SAC ¶ 45.

According to Plaintiffs, Mr. Zadek misrepresented material facts and/or failed to disclose material facts in connection with his solicitation of Plaintiffs.  For example,

> Mr. Zadek specifically stated to [Ms.] Shaper at the time he solicited each Promissory Note and Amendment that the investments were safe and secure, and Ms. Shaper could have her money back "at any time," despite that the notes were subordinated to a senior lender and stated on their face they would not be due for 180 days upon request.

SAC ¶ 51.

In addition, Mr. Zadek failed to disclose the following at the time he solicited Plaintiffs:

- That Defendants were not registered with the relevant government agencies as an

United States District Court
Northern District of California

investment adviser or broker/dealer.

- That there were risk factors associated with the Promissory Notes and what those risk factors were.

- That the Promissory Notes had a subordination provision and that subordination put the safety of Plaintiffs' investment at risk.[1]

- Lenders Funding's financial statements.

- The financial status of the third parties to whom Lenders Funding gave loans.

*See* SAC ¶ 58.

Another failure to disclose identified by Plaintiffs took place when Mr. Zadek sought certain Amendments to some of the Promissory Notes in December 2019.  Apparently, Mr. Zadek did not disclose that he needed the Amendments because Lenders Funding was not able to make

---

[1] The Promissory Notes that were issued to Plaintiffs provided that Plaintiffs would be paid interest at the rate of 8% per year.  Accrued interest would be paid quarterly.  As for the principal, it (as well as any accrued but unpaid interest) would be paid the earlier of (1) a date certain (usually about 5 years out) or (2) "180 days from demand."  However, the Promissory Notes also included a provision specifying that the Promissory Notes were

> subordinated to the outstanding secured indebtedness (the "Senior Debt") of Sovereign Bank . . . (. . . the "Senior Lender").  The payment of all principal and interest due . . . shall be subject to and contingent upon (i) there being no event of default existing and continuing under the Senior Debt at the time of such payment or (ii) the Borrower not being insolvent at the time of such payment(s) or rendered insolvent upon the making of such payment(s).

Some of the Promissory Notes had slightly different subordination language.  For example:

> This Note is subordinated to the outstanding secured indebtedness (the "Senior Debt") owed by Borrower to Alostar Bank of Commerce . . . (. . . the "Senior Lender"), and is subject to that certain Subordination and Intercreditor Agreement, dated on or about the Subordination Agreement Date, between the Junior Creditor defined therein, Senior Lender and Borrower . . . . By its acceptance of this Note, the Holder agrees to be bound by the provisions of such Subordination Agreement to the same extent that the Junior Creditor defined therein is bound.  The payment of all principal and interest due . . . shall be subject to and contingent upon, among other things, (i) there being no event of default existing and continuing under the Senior Debt at the time of such payment or resulting therefrom or (ii) the Borrower not being insolvent at the time of such payment(s) or rendered insolvent upon the making of such payment(s).

its payments owed to Ms. Shaper – specifically, because Lenders Funding had been defrauded by another company, Cash4Cases, Inc. ("C4C"), out of $5 million.  *See* SAC ¶ 53; *see also* SAC ¶ 54 (alleging that Defendants "knew that C4C's fraud in connection with the $5,000,000 loan [that Lenders Funding gave to it] severely negatively impacted Lenders Funding's ability to repay then-outstanding Promissory Note investors, including Ms. Shaper").  On their face, the Amendments extended the due date for the relevant Promissory Note and/or changed the Senior Lender.  *See* SAC, Ex. G (2019 Amendments).

In March 2020, Plaintiffs made a written demand on Defendants, asking that all outstanding funds invested in the Promissory Notes be returned.  *See* SAC ¶ 61 & Ex. I (email from Ms. Shaper to Mr. Zadek).  In spite of that demand, Defendants have not returned any funds. *See* SAC ¶ 64.  The total amount owing on the Promissory Notes is more than $1.6 million.  *See* FAC ¶ 64.

Based on, *inter alia*, the above allegations, Plaintiffs have asserted the following claims for relief.

    (1)    Failure to register as an investment adviser in violation of the Investment Advisers Act § 202(a)(11).  *See* 15 U.S.C. § 80b-2(a)(11).

    (2)    Failure to register as a broker and/or dealer in violation of the Securities Exchange Act.  *See generally* 15 U.S.C. § 78a *et seq.*

    (3)    Material misrepresentations and/or omissions in violation of § 10(b) of the Securities Exchange Act and Rule 10b-5.  *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

    (4)    Failure to register as a broker and/or dealer in violation of California Corporations Code § 25210(b).

    (5)    Failure to register as an investment adviser in violation of California Corporations Code § 25230(a).

    (6)    Material misrepresentations and/or omissions in violation of California Corporations Code § 25400.

    (7)    Fraudulent inducement.

United States District Court
Northern District of California

4

1   (8)    Intentional misrepresentation.

2   (9)    Promissory fraud.

3   (10)   Negligent misrepresentation.

4   (11)   Constructive fraud.

5   (12)   Financial elder abuse.

6   (13)   Breach of fiduciary duty.

7   (14)   Conversion.

8   (15)   Breach of contract.[2]

9                          **II.    <u>DISCUSSION</u>**

10  A.    <u>Legal Standard</u>

11        Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain

12  statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A

13  complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil

14  Procedure 12(b)(6).  *See* Fed. R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss

15  after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic*

16  *Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must

17  . . . suggest that the claim has at least a plausible chance of success.'"  *Levitt v. Yelp! Inc.*, 765

18  F.3d 1123, 1135 (9th Cir. 2014).  The court "accept[s] factual allegations in the complaint as true

19  and construe[s] the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St.*

20  *Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a

21  complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient

22  allegations of underlying facts to give fair notice and to enable the opposing party to defend itself

23  effectively."  *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted).  "A claim has facial

24  plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

25  inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The

26  plausibility standard is not akin to a probability requirement, but it asks for more than a sheer

27  _____

28  [2] Plaintiffs pled all of the claims above in their prior complaint.  The only claim that Plaintiffs
dropped from the prior complaint was the claim for unjust enrichment.

5

United States District Court
Northern District of California

possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

Although Defendants have challenged all of the claims asserted by Plaintiffs, the Court focuses on the federal claims first. If there are no viable federal claims, then it would make little sense to retain supplemental jurisdiction given the early stage the proceedings. *See* 28 U.S.C. § 1367(c)(3) (providing that a court may decline supplemental jurisdiction over a claim if the court "has dismissed all claims over which it has original jurisdiction").

B.    Whether Promissory Notes Constituted Securities Under Federal Law

As indicated above, Plaintiffs' federal claims are all federal securities claims. Specifically, the federal securities claims are as follows:

- Count 1: Failure to register as an investment adviser in violation of the Investment Advisers Act § 202(a)(11). *See* 15 U.S.C. § 80b-2(a)(11).

- Count 2: Failure to register as a broker and/or dealer in violation of the Securities Exchange Act. *See generally* 15 U.S.C. § 78a *et seq.*

- Count 3: Material misrepresentations and/or omissions in violation of § 10(b) of the Securities Exchange Act and Rule 10b-5. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

Each of these claims is dependent on there being a "security" at issue.

- Count 1: *See id.* § 80b-2(a)(11) (defining "investment adviser" as, *inter alia*, a "person who, for compensation, engages in the business of advising others . . . as to the value of *securities* or as to the advisability of investing in, purchasing, or selling securities"; adding that the term does not include "any lawyer, accountant, engineer, or teacher whose performance of such services is solely incidental to the practice of his profession") (emphasis added).

- Count 2: *See id.* § 78c(a)(4)-(5) (defining "broker" as a "person engaged in the business of effecting transactions in *securities* for the account of others" and defining "dealer" as a "person engaged in the business of buying and selling *securities* . . . for such person's own account through a broker or otherwise") (emphasis added).

- Count 3: *See* 15 U.S.C. § 78j(b) (providing that it is unlawful for a person "[t]o use or employ, in connection with the purchase or sale of any *security* registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe") (emphasis added).[3]

According to Defendants, each of the federal securities claims should be dismissed because, contrary to what Plaintiffs assert, the Promissory Notes did not qualify as securities, under either the Securities Exchange Act or the Investment Advisers Act. The Court previously agreed with Defendants that Plaintiffs had not sufficiently alleged that the Promissory Notes were securities.

"Whether a particular instrument is a security is ultimately a question of law, but where there are disputed facts, the issue may be one for the jury." *Ahern v. Gaussoin*, 611 F. Supp. 1465, 1477 (D. Or. 1985); *see also SEC v. J.T. Wallenbrock & Assocs.*, 313 F.3d 532, 536 (9th Cir. 2002) (stating that the issue of whether notes were "securities" was a legal question); *Great W. Bank & Tr. v. Kotz*, 532 F.2d 1252, 1255 (9th Cir. 1976) (in a case where district court held at summary judgment that a note was not a "security," stating that "asking whether GWB has provided 'risk capital' subject to the management skill of Artko is the same as asking whether GWB has made an 'investment' in return for Artko's 'security'" and, "[i]n this respect, the issue raised is ultimately one of law," but "it is clear to us that in appropriate circumstances a properly instructed jury can determine whether as a matter of fact a disputed instrument is or is not a 'security'"); *cf. Warfield v. Alaniz*, 569 F.3d 1015, 1019 (9th Cir. 2009) (stating that, "'[a]lthough characterization of a transaction raises questions of both law and fact, the ultimate issue of whether or not a particular set of facts, as resolved by the factfinder, constitutes an investment contract is a question of law'").

---

[3] *See also* 17 C.F.R. § 240.10b-5 (providing that it is unlawful for a person "(a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security").

United States District Court
Northern District of California

The Securities Exchange Act defines "security" as follows:

> The term "security" means *any note*, stock, treasury stock, security future, security-based swap, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; *but shall not include* currency or *any note*, draft, bill of exchange, or banker's acceptance, *which has a maturity at the time of issuance of not exceeding nine months*, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

15 U.S.C. § 78c(a)(10) (emphasis added).

The Investment Advisers Act has a similar definition.

> "Security" means *any note*, stock, treasury stock, security future, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security (including a certificate of deposit) or on any group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guaranty of, or warrant or right to subscribe to or purchase any of the foregoing.

*Id.* § 80b-2(a)(18).

The parties agree that the critical case on what constitutes a "security" is *Reves v. Ernst & Young*, 494 U.S. 56 (1990).  In *Reves*, the Supreme Court addressed "security" as used in the Securities Exchange Act.  The Court noted first that

> [t]he fundamental purpose undergirding the Securities Acts is "to eliminate serious abuses in a largely unregulated securities market." In defining the scope of the market that it wished to regulate, Congress painted with a broad brush.  It recognized the virtually limitless scope of human ingenuity, especially in the creation of

United States District Court
Northern District of California

8

> "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," and determined that the best way to achieve its goal of protecting investors was "to define 'the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.'"  Congress therefore did not attempt precisely to cabin the scope of the Securities Acts.  Rather, it enacted a definition of "security" *sufficiently broad to encompass virtually any instrument that might be sold as an investment*.
>
> . . . . Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called.

*Id.* at 60-61 (emphasis added and omitted).

The *Reves* Court noted that "stock is, as a practical matter, always an investment if it has the economic characteristics traditionally associated with stock."  *Id.*  In contrast, a note is not always a security, notwithstanding the fact that the Securities Exchange Act includes "any note" in its definition of "security."  *See id.* at 62-63 (stating that "the phrase 'any note' should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Acts").  The Court instructed that there is a ***presumption*** that a note is a security, but that presumption may be rebutted.  *See id.* at 64.

As to how that presumption may be rebutted, the Supreme Court indicated that a court must "inquire first whether the promissory note bears a 'family  resemblance' to a judicially-created list of non-security instruments.  If so, then the note is not a security."  *SEC v. J.T. Wallenbrock & Assocs.*, 313 F.3d 532, 536-37 (9th Cir. 2002).  Promissory notes that are on the judicially-crafted list of exceptions include the following:

> "the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, . . . a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized)[,]" [and] "notes evidencing loans [made] by commercial banks for current operations [of borrowers]."

*Reves*, 494 U.S. at 65.  Regarding the last category of promissory notes, the Ninth Circuit has noted that "commercial loans for current operations are made to allow a borrower to continue 'to

operate a business smoothly during a period when cash inflows and outflows do not match up.'"

*McNabb v. SEC*, 298 F.3d 1126, 1131 (9th Cir. 2002).

The *Reves* Court also instructed that, if a "note does not strongly resemble one of the enumerated exceptions, [a court must] then determine whether the note is a type that should be added to the list." *Wallenbrock*, 313 F.3d at 537.  To determine whether a promissory note is of a type that should be added to the list, a court considers four factors:

> (1) the "motivations that would prompt a reasonable seller and buyer to enter into" the transaction; (2) the "plan of distribution" of the instrument; (3) the "reasonable expectations of the investing public"; and (4) "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument."  Failure to satisfy one of the factors is not dispositive; they are considered as a whole.

*Wallenbrock*, 313 F.3d at 537 (hereinafter referred to as the "*Reves* factors").  *See, e.g.*, *SEC v. The Rose Fund, LLC*, No. C 03-04593 WHA, 2004 U.S. Dist. LEXIS 31672, at *19-20 (N.D. Cal. Sep. 17, 2004) (applying the four *Reves* factors).  The four *Reves* factors generally explain why certain notes are on the judicially-created list of nonsecurity instruments in the first place.  *See id.* (thus stating that there is effectively "a single inquiry" as to whether a note should be deemed a "security").

In the instant case, Defendants do not make a specific contention that the Promissory Notes at issue strongly resemble one of the enumerated exceptions in *Reves*.  Therefore, the Court focuses on the four *Reves* factors.

     1.     First *Reves* Factor

As noted above, the first *Reves* factor takes into consideration the motivations that would prompt a reasonable seller and buyer to enter into the transaction.  For example,

> [i]f the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a "security."  If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a "security."

United States District Court
Northern District of California

1    *Reves*, 494 U.S. at 66.[4]

2       In the SAC, Plaintiffs have explicitly alleged that they were motivated to purchase the

3 Promissory Notes at issue because of profit: "[Plaintiffs'] sole purpose in investing in the

4 Promissory Notes was profit." SAC ¶ 22.  Although this allegation is fairly conclusory, there is

5 some evidence to corroborate Plaintiffs' claim – *i.e.*, the 8% interest rate provided for in the

6 Promissory Notes, which, while not extraordinary, is a decent rate of return.  *See Reves*, 494 U.S.

7 at 68 n.4 ("emphasiz[ing] that by 'profit' in the context of notes, we mean 'a valuable return on an

8 investment,' which undoubtedly includes interest"); *cf. Jeanne Piaubert, S.A. v. Sefrioui*, No. 97-

9 56131, 2000 U.S. App. LEXIS 2462, at *9 (9th Cir. Feb. 17, 2000) (stating that, if plaintiff "truly

10 had expected to profit from the note, as it now claims, it would have demanded a much higher rate

11 of return than the prime rate in order to compensate it for the substantial risk of default that an

12 untested business venture necessarily entails").

13       As for what was Lenders Funding's purpose in selling the Promissory Notes, Plaintiffs

14 have not made any specific argument.  However, it can fairly be inferred that, as a general matter,

15 the purpose was to raise money for the general use of the business – *i.e.*, Lenders Funding used the

16 money raised from Promissory Notes to give loans to third parties.[5]

17       2.     <u>Second *Reves* Factor</u>

18       The second *Reves* factor considers the plan of distribution for the instrument.  In *Reves*, the

19 Supreme Court explained that "we examine the 'plan of distribution' of the instrument, to

20

---

21 [4] The *Reves* Court seemed to making a distinction here between an investment and a commercial
22 transaction – an approach that some of the lower appellate courts had taken.  *See id.* at 63.  *See,
e.g.*, *Hunnsinger v. Rockford Bus. Credits, Inc.*, 745 F.2d 484, 488 (7th Cir. 1984) (in a pre-*Reves*
case, stating that "[t]he commercial/investment test seeks to confine the protection of the securities
23 laws to investors and exclude from the acts' protection borrowers and lenders in commercial
settings"); *Futura Dev. Corp. v. Centex Corp.*, 761 F.2d 33, 40 (1st Cir. 1985) (in a pre-*Reves*
24 case, stating that, under the "commercial v. investment" test, a "court looks to see whether a
transaction more closely resembles typical investment situations or typical mercantile or
25 commercial transactions").

26 [5] There is one possible exception – *i.e.*, Plaintiffs have alleged that certain Promissory Notes were
amended in December 2019 because Lenders Funding did not have the money to pay Plaintiffs
27 what was owed as a result of being defrauded by a third party (C4C).  It could be argued,
therefore, that the Amendments were undertaken to correct for cash flow difficulties, and thus
28 should not be deemed securities.  Because Defendants did not make this specific argument, the
Court does not entertain it.

determine whether it is an instrument in which there is 'common trading for speculation or investment.'" *Id.* at 66 (emphasis added).  The Court indicated that a note is not disqualified from being a security just because the plan of distribution for the note does not involve trade on an exchange: if a note is "offered and sold to a *broad segment of the public*," that "establish[es] the requisite 'common trading' in an instrument."  *Id.* at 68 (emphasis added); *see also Wallenbrock*, 313 F.3d at 539 (noting that "[t]he broad availability of the notes, plus Wallenbrock's evident interest in widening the scope of distribution, tips this factor strongly in favor of classifying the note as a security").

In the SAC, Plaintiffs allege that Lenders Funding "sold hundreds of millions of dollars of . . . Promissory Notes to hundreds of investors (primarily but not exclusively domiciled in the State of California) for over a decade."  SAC ¶ 24.  Although this allegation by itself is somewhat conclusory in nature, Plaintiffs have provided six exhibits to support their claim.  Those exhibits (A through F) are addressed below.

**Exhibit A.**  Exhibit A is a part of Lenders Funding's website.  The document states in relevant part as follows:

Lenders Funding provides the assurance you need to grow or take on larger clients. As you increase your own source of funds, you can retire our participation, maximizing your ability to earn.

Since formation, we have worked with over 150 lenders and factors and have supplied several hundred million dollars in funding. Bob Zadek has designed the quintessential legal documents that allow the participation process to be painless and fair.

In addition to our participation program, Lenders Funding makes direct loans on real estate, machinery and equipment and accounts receivable. With offices on both the west and east coasts, Lenders Funding is perfectly positioned to help Leads realize their full potential.

SAC, Ex. A (website).  Plaintiffs focus on the second paragraph above – *i.e.*, "we . . . have supplied several hundred million dollars in funding."  The problem for Plaintiffs is that this statement simply indicates that Lenders Funding provides loans to third parties; it does not state where Lenders Funding gets the money to extend the loans (whether by issuing Promissory Notes or otherwise).  Notably, the Promissory Notes on their face refer to Senior Lenders.  Nor does the document reflect anything about the distribution of any Promissory Notes.  Thus, Exhibit A is not particularly compelling evidence.

1        **Exhibit B.**  Exhibit B consists of three "Form Ds" that Lenders Funding filed with the

2   SEC.  (The forms are dated June 24, 2003; November 8, 2004; and March 12, 2008.  As a point of

3   reference, the first Promissory Note issued to Plaintiffs was in April 2009.)  A Form D relates to

4   Regulation D.  "Under the federal securities laws, any offer or sale of a security must either be

5   registered with the SEC *or* meet an exemption.  Regulation D under the Securities Act provides a

6   number of exemptions from the registration requirements, allowing some companies to offer and

7   sell their securities without having to register the offering with the SEC."

8   https://www.investor.gov/introduction-investing/investing-basics/glossary/regulation-d-offerings

9   (last visited July 21, 2021); *see also* SAC ¶ 26 ("Regulation D Offering Notices are filed with the

10  [SEC] by issuers (Lenders Funding) of debt securities (Promissory Notes) as a means to perfect a

11  securities private placement 'safe harbor' exemption under the 1933 Act, and to alert the [SEC] as

12  to the amount of securities being sold by such issuers of private placements.").

13          • In the first Form D (dated June 24, 2003), it appears that Lenders Funding offered

14              debt securities totaling $700,000.  The amount already sold was $50,000.

15          • In the second Form D (dated November 8, 2004), it appears that Lenders Funding

16              offered debt securities totaling $3,000,000.  The amount already sold was

17              $1,450,000 (to a total of 6 investors).

18          • In the third Form D (dated March 12, 2008), it appears that Lenders Funding

19              offered debt securities totaling $30,000,000.  The amount already sold was

20              $500,000 (to 2 investors).

21      Given these forms, it does *not* appear that there was a broad distribution of the debt

22  instruments; for the second and third Form Ds at least, there was only a total of 8 investors.

23  Nevertheless, the fact that Lenders Funding filed the Form Ds suggests that it did sell securities (in

24  spite of what seems to be a small number of investors) – otherwise, it would not have filed the

25  Form Ds with the SEC in the first place.  Thus, the Form Ds are relevant, but not because of the

26  second *Reves* factor but rather because of the first *Reves* factor (*i.e.*, the seller's motivations).

27      The Court acknowledges that, arguably, the Form Ds should not be given undue weight

28  because Lenders Funding's sale of debt securities in the past does not dictate whether the

United States District Court
Northern District of California

1    Promissory Notes issued to Plaintiffs specifically were also securities.[6]  This is, in fact, what

2    Defendants argued for the first time in their reply.

> The former SEC filings have no connection to the Notes issued to
> Plaintiff.  The SEC filings were signed and filed by Defendant
> Zadek's former partner "H. Bruce Bronson" who was not involved
> with the Notes issued to Plaintiff.  SAC Exh. B.  The former SEC
> filings were part of a different business model, *never acted upon by
> Defendants*, that predated the Notes issued to Plaintiff by many
> years. From 2003 to 2008 Lenders Funding considered issuing
> securities to raise capital for their business. However, Lenders
> Funding *did not to go through with that plan and did not issue the
> securities*.  In 2009 Lenders Funding changed its business model
> approach to raising capital and decided to rely on funds borrowed
> from banks through a line of credit and a small group of close
> friends and relatives (including Plaintiff).  The "$30,000,000 in
> promissory notes issued" statement that Plaintiff relies on in her
> opposition and SAC is the amount of money Defendants had
> borrowed over the course the of the life of the business, which
> included loans from banks and close friends and relatives.  *See* SAC
> ¶ 30 and Opp. at pg. 12 lines 13-17.  The Notes and subordination
> agreements that Plaintiff signed indicate the banks for which
> Defendants had a line of credit with.  *See* SAC Exh. G parts 1
> through 15[.]  *See also* RJN Exhs. 1, 2, 3.

14   Reply at 5 (emphasis in original).

15        The problem with Defendants' argument in reply is that it is predicated on information

16   outside the four corners of the complaint and of which the Court may not take judicial notice.

17   Thus, contrary to what Defendants contend, the Form Ds do suggest that, in the past, Defendants

18   sold debt securities which makes it more plausible that the Promissory Notes at issue could also be

19   securities.  This is particularly true because, as Plaintiffs point out, the Promissory Notes issued to

20   them each bore the following legend at the top:

> THIS NOTE HAS NOT BEEN REGISTERED PURSUANT TO
> THE SECURITIES ACT OF 1933, AS AMENDED, OR
> APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE
> ASSIGNED, SOLD, PLEDGED, OR OTHERWISE
> TRANSFERRED UNLESS THE TRANSACTION RELATING
> THERETO COMPLIES WITH OR IS EXEMPT FROM THE
> REGISTRATION REQUIREMENTS OF THE ACT AND SUCH
> LAWS AND THE COMPANY IS PROVIDED AN OPINION OF
> COUNSEL TO THAT EFFECT WHICH IS SATISFACTORY TO
> IT.

---

[6] In this regard, it is worth noting that the first Promissory Note was not issued to Plaintiffs until
April 2009 – *i.e.*, about a year after the last Form D.

14

United States District Court
Northern District of California

SAC, Ex. G (Promissory Notes).  This "disclaimer" suggests that the Promissory Notes were securities, especially given Lenders Fundings' prior practice of selling debt securities (and thus, the Form Ds).

**Exhibit C.**  Exhibit C is the February 2006 balance sheet for Lenders Funding.  On the fourth and fifth pages, the balance sheet indicates that liabilities of the company included "Notes Payable" to about 20 people/entities (totaling $5,231,172).  As a facial matter, this does not appear to be a broad distribution of the instruments, notwithstanding the substantial sums involved.

**Exhibit D.**  Exhibit D is the first page of "the Subscription Agreement to a Promissory Note issued to [Plaintiffs]" in 2016.  SAC ¶ 30.  The Subscription Agreement states that Lenders Funding has issued $30 million in Promissory Notes.  This sum – though substantial – does not by itself establish a broad distribution of the Promissory Notes.  In fact, there is language in the Subscription Agreement that somewhat suggests to the contrary.  The Subscription Agreement states that "[t]he minimum principal amount of Notes being offered to investors is $100,000." $30,000,000/$100,000 = 300.  In other words, it is entirely possible that the distribution of the instruments was to no more than 300 people.  It is unclear whether a distribution to 300 people constitutes a distribution to a broad segment of the public.  *Cf. McNabb*, 298 F.3d at 1132 ("To be sure, six customers in total does not constitute 'a broad segment of the public,' *Stoiber*, 161 F.3d at 751 (thirteen customers not considered to be 'a broad segment of the public'), but this fact alone is not dispositive.").

**Exhibit E.**  Exhibit E is Lenders Funding's 2019 income statement.  Plaintiffs suggest that the document shows Mr. Zadek was paid a management fee of more than $1 million, but it is not clear where they got that information from the document.  Plaintiffs might be referring to the line entry for "Professional Fees" which totals about $1.28 million.  Even if this were Mr. Zadek's management fee, *see* Reply at 6 (arguing that professional fees actually refers to *outside* professionals such as attorneys and accountants), that does not mean – as Plaintiffs claim – that Lenders Funding issued $33 million in Promissory Notes.  *See* SAC ¶ 31.  Plaintiffs calculated the $33 million figure because (1) Mr. Zadek was allegedly paid a 3% management fee out of Lenders Funding's assets and (2) 3% of $33 million is about $1 million.  But this assumes that all of

United States District Court
Northern District of California

United States District Court
Northern District of California

Lenders Funding's assets come from money obtained through Promissory Notes. In any event, even if Plaintiffs' calculation has some merit (as indicated above, the Subscription Agreement in 2016 stated that Lenders Funding had issued $30 million in Promissory Notes), it is debatable whether the value of the Promissory Notes is that indicative of a broad distribution of the instruments.

**Exhibit F.** Exhibit F is Lenders Funding's profit and loss statement for January 2020. The document reflects as an "Interest Expense" $758,180. Plaintiffs extrapolate that this amounts to more than $9 million in interest payments for a year. The problem for Plaintiffs is that it is not clear that the interest payments come only from Promissory Notes. And even if that were true, the value of the Promissory Notes does not provide much information, if any, about the distribution of the instruments.

In summary, none of the exhibits provided by Plaintiffs provides clear support for their claim that Lenders Funding sold Promissory Notes "to hundreds of investors." SAC ¶ 33. However, the inferences that might be drawn about the broad distributions of Promissory Notes together with both Exhibit B (the Form Ds) and the legends on the Promissory Notes issued to Plaintiffs are probative of the first *Reves* factor and suggest that Lenders Funding was of the view that the Promissory Notes were securities.

3.    Third *Reves* Factor

The third *Reves* factors considers the reasonable expectations of the investing public. *See Reves*, 464 U.S. at 66. Under this factor, a court considers "what a 'reasonable investor' would think, not what the 'specific individuals in question' might have thought." *Wallenbrock*, 313 F.3d at 539.

In the SAC, Plaintiffs allege that the investing public would view the Promissory Notes as securities given the legend that each Promissory Note bore at the top (as quoted above). *See* SAC ¶ 35. This argument has merit.

4.    Fourth *Reves* Factor

The fourth *Reves* factor considers whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument. *See Reves*, 464 U.S. at 66. The

16

Ninth Circuit has indicated that this factor may counter some of the other *Reves* factors. For example, in *McNabb*, it cautioned that a limited distribution of an instrument – to just a few individuals – was not "dispositive. Instead, [this fact] must be weighed against the purchasing individual's need for the protection of the securities laws." *McNabb*, 298 F.3d at 1132. The Ninth Circuit took into account that the notes at issue were sold to six individuals, and "not sophisticated financial institutions"; thus, the individuals would benefit from the protection of the securities laws. *Id.* Considering (on the one hand) the limited distribution of the notes and (on the other) the fact that the purchasers were individual investors, the court ultimately concluded that the second *Reves* factor did not weigh in favor of either of either party. *See id.* (stating that, "[v]iewing these two facts, it appears this factor does not support either McNabb's or the Commission's position").

In the instant case, the Promissory Notes do not appear to involve any of the risk-reducing factors specified in *Reves*. *See Reves*, 494 U.S. at 67, 69 (indicating that risk is reduced if a note were collateralized or insured or subject to substantial regulation). However, arguably there were other risk-reducing elements such as the fixed 8% interest rate as well as the return of principal and interest within 180 days of demand. On the other hand, these protections were somewhat offset by the fact that the Promissory Notes were subordinated to a Senior Lender. *Compare Wallenbrock*, 313 F.3d at 540 (concluding that "the fixed nature of [an] interest rate [on a note did not] act as a risk-reducing factor because the interest was coming from other investors' money" – *i.e.*, "[a]s long as only a limited number of investors sought to collect interest, that high return was guaranteed[,] but as soon as a critical mass wanted out, the whole pyramid threatened to collapse"). This factor weighs in Plaintiff's favor.

5.   Summary

As indicated by the above, the *Reves* factors do not clearly point to a legal conclusion that the Promissory Notes are securities. However, there appear to be sufficient factual allegations (even if they are ultimately in dispute) to support that legal conclusion. *See Ahern*, 611 F. Supp. at 1477 (stating that "[w]hether a particular instrument is a security is ultimately a question of law, but where there are disputed facts, the issue may be one for the jury").

Because it is plausible that the Promissory Notes at issue were securities, the Court now

turns to the specific challenges made by Defendants to each of the federal securities claims.

C.     Failure to Register as Investment Adviser (Federal Securities Claim)

In the first cause of action, Plaintiffs assert a claim that Defendants failed to register as an investment adviser as required by federal law (*i.e.*, the Investment Advisers Act). *See In re Living Bens. Asset Mgmt., L.L.C.*, 916 F.3d 528, 532-33 (5th Cir. 2019) (noting that, under 15 U.S.C. § 80b-3(a), "[t]he IAA prohibits unregistered investment advisers from using the instrumentalities of interstate commerce 'in connection with' their businesses" and, under § 80b-15(b), "[a] contract made in violation of the IAA is void as to the unregistered adviser"). Defendants argue that this federal claim should be dismissed because Plaintiffs failed to adequately allege that Defendants are investment advisers. "Investment adviser" is defined by statute as a "person who, for compensation, engages in the business of advising others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." 15 U.S.C. § 80b-2(a)(11). The term, however, does not include "any lawyer, accountant, engineer, or teacher whose performance of such services is solely incidental to the practice of his profession." *Id.*

The SAC fails to plead a viable investment advertiser claim. Plaintiffs have not adequately alleged that Defendants were in the business of giving investment advice or that they were paid for such advice. *See, e.g.*, SAC ¶ 81 (alleging that "Mr. Zadek acted as Ms. Shaper's investment adviser, and she understood and believed that he was her investment adviser, in connection with the investments"). The fact that Defendants sold Promissory Notes to Plaintiffs does not mean that they were in the business of giving investment advice. And even if Defendants did give investment advice to Plaintiffs, there is no allegation that Plaintiffs compensated Defendants for that advice.

The Court therefore dismisses the investment adviser claim. The dismissal is with prejudice because, in the prior motion, Defendants alerted Plaintiffs to a deficiency with the claim but Plaintiffs did not provide any additional allegations – notwithstanding the Court's expression permission to enhance their factual allegations. *See* Docket No. 30 (minute order) (giving Plaintiffs leave to amend the federal securities claims because they had not adequately pled that the Promissory Notes at issue were securities; adding that, "[b]ecause Plaintiffs have leave to

18

1   amend to address the deficiency above, they may also amend their pleading to enhance other

2   factual allegations relevant to the federal securities claims").

3   D.   <u>Failure to Register as Broker or Dealer</u>

4          In the second cause of action, Plaintiffs maintain that Defendants failed to register as a

5   broker or dealer as required by federal law (*i.e.*, the Securities Exchange Act).  *See* 15 U.S.C. §

6   78o(a)(1) (providing that "[i]t shall be unlawful for any broker or dealer . . . (other than such a

7   broker or dealer whose business is exclusively intrastate and who does not make use of any

8   facility of a national securities exchange) to make use of the mails or any means or instrumentality

9   of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase

10  or sale of, any security . . . unless such broker or dealer is registered"); *id.* § 78cc(b) (providing

11  that "[e]very contract made in violation of any provisions of this title or of any rule or regulation

12  thereunder, and every contract . . . the performance of which involves the violation of . . . any

13  provision of this title or any rule or regulation thereunder, shall be void").  Similar to above,

14  Defendants argue that this federal claim should be dismissed because Plaintiffs have not

15  adequately alleged that they are brokers or dealers.

16          The statute defines "broker" as a "person engaged in the business of effecting transactions

17  in securities for the account of others."  *Id.* § 78c(a)(4)(A).  The Ninth Circuit Model Civil Jury

18  Instruction No. 18.1 defines broker as one who "buys and sells securities for clients, usually for a

19  commission."  9th Cir. Model Civil Jury Instruction No. 18.1.  Defendants cannot be brokers

20  given that they did not sell any Promissory Notes for others but rather issued such Notes on their

21  own behalf.  As the Fifth Circuit noted in *Regional Properties, Inc. v. Financial & Real Estate*

22  *Consulting Co.*, 752 F.2d 178 (5th Cir. 1985), "[t]here is no clear statutory exemption for 'issuers'

23  of securities from the broker registration requirement" and that an exemption "arises by

24  implication from the definition of 'broker'"; "[a]n issuer that effects the distribution of its own

25  securities is not engaging in transactions for the account of others but is instead selling securities

26  for its own account [and] [t]hus an issuer is not subject to the Act's broker registration

27  requirements."  *Id.* at 184 n.4.

28          As for "dealer," the statute defines the term as a "person engaged in the business of buying

19

United States District Court
Northern District of California

and selling securities . . . for such person's own account through a broker or otherwise." *Id.*
78c(a)(5)(A); *see also* 9th Cir. Model Civil Jury Instruction No. 18.1 (defining dealer as one who
"buys securities and resells them to clients"). *See, e.g.*, *Eastside Church of Christ v. Nat'l Plan,
Inc.*, 391 F.2d 357, 361-62 (5th Cir. 1968) (finding defendant a dealer because it "purchased many
church bonds prior to the ones in question for its own account as a part of its regular business and
sold some of them"). Here, although Defendants issued Promissory Notes for their own account,
it is not plausible that they were dealers. First, the statute refers to not just selling securities but
also buying securities. Plaintiffs have not alleged that Defendants purchased securities. Second,
the statute provides that a dealer is one "in the *business* of buying and selling securities." *Id.*
(emphasis added). Indeed, the statute goes on to provide that "[t]he term 'dealer' does not include
a person that buys or sells securities . . . for such person's own account, either individually or in a
fiduciary capacity, *but not as part of a regular business*." *Id.* § 78c(a)(5)(B); *United States SEC v.
River N. Equity LLC*, 415 F. Supp. 3d 853, 858 (N.D. Ill. 2019) (noting that "[t]he 'dealer'
definition has not been subject to extensive judicial interpretation[,] [b]ut courts that have
construed it generally require a 'certain regularity of participation in securities transactions'").
Plaintiffs have not explained how Defendants were in the business of buying and selling securities.
If a company could be deemed a seller simply because it issues its own securities, as Plaintiffs
suggest, *see* Compl. ¶ 33 (asserting that, "[g]iven the significant dollar amounts of securities sold
over many years, Defendants were 'in the business of distributing securities'"), then practically all
companies would be considered dealers. This would make little sense. *Cf.* Cal. Corp. Code §
25004(b) (providing that a broker-dealer is "any person engaged in the business of effecting
transactions in securities in this state for the account of others or for that person's own account"
and "includes a person engaged in the regular business of issuing or guaranteeing options with
regard to securities *not* of that person's own issue"; adding that a broker-dealer "does not include
any of the following: (1) Any other issuer") (emphasis added).

The Court therefore dismisses the broker-dealer claim. For the same reasons as stated
above, the dismissal is with prejudice.

1    E.      Section 10(b) and Rule 10b-5 (Federal Securities Claim)

2            Plaintiffs' third cause of action is a claim for violation of § 10(b) and/or Rule 10b-5.

3    Section 10(b) provides that it is "unlawful for any person . . . [t]o use or employ, in connection

4    with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance

5    in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. §

6    78j(b).  Rule 10b-5 provides that it is unlawful for any person to, *e.g.*, "make any untrue statement

7    of a material fact or to omit to state a material fact necessary in order to make the statements

8    made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. §

9    240.10b-5.

10           Notably, the § 10(b)/Rule 10b-5 claim is governed by the PSLRA.  The PSLRA provides

11   in relevant part that,

12                [i]n any private action arising under this title [15 U.S.C. § 78a *et
             seq.*] in which the plaintiff alleges that the defendant –
13
                (A)      made an untrue statement of a material fact; or
14
                (B)      omitted to state a material fact necessary in order to make the
15                       statements made, in the light of the circumstances in which
                         they were made, not misleading;
16
             the complaint shall specify each statement alleged to have been
17           misleading, the reason or reasons why the statement is misleading,
             and, if an allegation regarding the statement or omission is made on
18           information and belief, the complaint shall state with particularity all
             facts on which that belief is formed.
19

20   15 U.S.C. § 78u-4(b)(1).

21           The PSLRA further provides that,

22                in any private action arising under this title [15 U.S.C. § 78a *et seq.*]
             in which the plaintiff may recover money damages only on proof
23           that the defendant acted with a particular state of mind, the
             complaint shall, with respect to each act or omission alleged to
24           violate this title, state with particularity facts giving rise to a strong
             inference that the defendant acted with the required state of mind.
25

26   *Id.* § 78u-4(b)(2).

27           In their motion, Defendants argue that, for the § 10(b)/Rule 10b-5 claim, Plaintiffs have

28   failed to satisfy both the specificity/particularity requirement and the state-of-mind requirement

above.  Defendants also make a safe harbor argument (which applies to forward-looking

statements only).

### 1.   Specificity/Particularity

The Court rejects Defendants' contention that Plaintiffs failed to plead the material

misrepresentations and/or omissions with sufficient specificity.  For example, as noted above,

Plaintiffs have alleged that Defendants told Ms. Shaper, "at the time he solicited each Promissory

Notes and Amendment that the investments were safe and secure, and Ms. Shaper could have her

money back 'at any time,' despite that the notes were subordinated to a senior lender and stated on

their face they would not be due for 180 days upon request."  SAC ¶ 51.  Also, Plaintiffs have

asserted that, at the time of the 2019 Amendments, Defendants' claim that they could pay the

money back at any time was false because they failed to disclose that they had been defrauded out

of $5 million by C4C and thus they had a "liquidity crisis."[7]  Compl. ¶¶ 55, 57.

### 2.   State-of-Mind Requirement

However, the Court agrees with Defendants that Plaintiffs have failed to plead facts giving

rise to a strong inference of scienter – scienter which, for a § 10(b)/Rule 10b-5 claim, requires an

intent to defraud or at least reckless disregard of the truth.  *See Prodanova v. H.C. Wainwright &*

*Co., LLC*, No. 19-56048, 2021 U.S. App. LEXIS 10124, at *10 (9th Cir. Apr. 8, 2021) (in a §

10(b)/Rule 10b-5 case, stating that, "[t]o support a 'strong inference' of scienter under the PSLRA,

a complaint must allege that the defendant made false or misleading statements with an 'intent to

deceive, manipulate, or defraud,' or with deliberate recklessness"); *see also Gebhart v. SEC*, 595

F.3d 1034, 1041 (9th Cir. 2010) (noting that "[s]cienter may be established, therefore, by showing

that the defendants knew their statements were false, or by showing that defendants were reckless

as to the truth or falsity of their statements").

For example, for the most part, Plaintiffs have simply pled in conclusory fashion that

---

[7] Plaintiffs have characterized the C4C theory of liability as an omission of a material fact – *i.e.*, Defendants did not disclose the C4C problem to Plaintiffs.  However, ultimately, the C4C theory is more an affirmative misrepresentation rather than an omission of fact.  At bottom, Plaintiffs claim that the representation that Defendants could pay back the money at any time was false at the time of the 2019 Amendments *because* of the C4C problem.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Defendants knew that their affirmative representations "were false when made . . . to [Ms.]

2  Shaper."  SAC ¶ 52; *see also* SAC ¶ 75 (alleging that Mr. Zadek "knew [his affirmative

3  representations] were false and he had no basis for the statements"); SAC ¶ 76 (alleging that

4  "[Mr.] Zadek intended that [Ms.] Shaper rely on said foregoing statements and representations (as

5  alleged in ¶¶ 51-52, 74)").  Plaintiffs have not given any specifics as to why Defendants did not

6  believe that the Promissory Notes were safe or secure *at the time of the solicitation*; nor have they

7  given any specifics as to why Defendants did not believe *at the time of solicitation* that they could

8  repay upon demand.[8]

9      The one possible exception relates to C4C.  As noted above, Plaintiffs take the position

10  that, at the time of the 2019 Amendments, Defendants knew they could not pay back the money at

11  any time because they had been defrauded out of $5 million by C4C and thus faced a liquidity

12  crisis.  The problem for Plaintiffs is that they have not made any factual allegations to support the

13  claim that Defendants faced a liquidity crisis as a result of the events related to C4C.

14      Admittedly, $5 million is a significant sum.  But Plaintiffs are required to plead with

15  particularity facts giving rise to a *strong* inference that Defendants acted with the requisite

16  statement of mind.  Five million dollars as an absolute number is not sufficient to support a

17  liquidity crisis, particularly given other allegations in the complaint about the aggregate sum of

18  money raised for Defendants' lending operations.  For example, Plaintiffs have alleged that

19  Defendants have issued Promissory Notes "in the aggregate amount of hundreds of millions of

20

21  _____

22  [8] The Court does not address whether Plaintiffs could have reasonably relied on a representation
   that they could be repaid at any time, given that (1) all of the Promissory Notes on their face refer
   to subordination; (2) Plaintiffs separately signed three Subordination Agreements, *see* Defs. RJN,
23  Exs. 1-3 (Subordination Agreements, dated March 2009, April 2014, and May 2016); (3) Plaintiffs
   had access to financial advisers to assist her; and (4) Ms. Shaper and Mr. Zadek were previously
24  married.  *See, e.g.*, SAC, Ex. J (email from financial adviser to Mr. Zadek).  *See generally Qun v.
   Karstetter*, No. 14-cv-1362-CAB (DHB), 2014 U.S. Dist. LEXIS 197399, at *32 (S.D. Cal. Sep.
25  24, 2014) (noting that whether reliance is reasonable is generally a question of fact for the jury,
   though it may be decided if the facts permit reasonable minds to come to only one conclusion;
26  adding that factors that may be considered include: "'(1) the sophistication of expertise of the
   plaintiff in financial and securities matters; (2) the existence of long standing business or personal
27  relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship;
   (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff
28  initiated the stock transaction or sought to expedite the transaction; and (8) the generality or
   specificity of the misrepresentations'").

United States District Court
Northern District of California

dollars since 2003." Compl. ¶ 2 (emphasis omitted). If Defendants, as alleged, were able to raise hundreds of millions of dollars over the years, then the $5 million amount loaned to C4C would not clearly pose a liquidity crisis. In addition, Exhibit E attached to the SAC is a profit and loss statement for Lenders Funding for the year 2019 (January through December). The document reflects that Lenders' Funding net income for the year 2019 was approximately $2.8 million (gross income was close to $9 million). *See* SAC, Ex. E (profit and loss statement). This is significantly more than the principal at issue with the 2019 Amendments (approximately $500,000). *See* SAC, Ex. G (2019 Amendments). The profit and loss statement for January-February 2020 attached at Exhibit F to the SAC reflects net income of approximately $410,000 (gross income was about $1.5 million). Absent establishment of a clear material impact on liquidity, Plaintiffs have failed to allege facts giving rise to a strong inference of scienter relative to the C4C loan.

Moreover, even if the requisite state of mind could be strongly inferred, Plaintiffs must still include allegations showing that they were injured as a result of Defendants' misconduct in 2019. *See Dsam Glob. Value Fund v. Altris Software*, 288 F.3d 385, 388 (9th Cir. 2002) ("To state a claim under Section 10(b) and Rule 10b-5, Appellants must allege: (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which Appellants relied (5) which proximately caused their injury."). Here, Plaintiffs claim that they would not have entered into the 2019 Amendments if they had known that they could not be paid back on demand, *see* SAC ¶ 56, and that they were injured because they have not been paid back all money on demand. But Plaintiffs fail to take into account that, if the 2019 Amendments had not taken place, they would still be subject to the terms of the earlier Promissory Notes – and under those Notes, Plaintiffs' interests were subordinated to those of the Senior Lenders (*i.e.*, they could not be paid back at any time). Plaintiffs fail to establish that 2019 Amendments caused the current alleged injury.

Accordingly, the Court finds the § 10(b)/Rule 10b-5 claim deficient, and therefore dismisses the cause of action for failure to state a claim. As above, the dismissal is with prejudice.

///

///

///

<div style="writing-mode: vertical-rl">United States District Court
Northern District of California</div>

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.   CONCLUSION

For the foregoing reasons, the Court dismisses the federal securities claims with prejudice. The only claims remaining are state law claims for which there is no independent diversity jurisdiction.  The Court declines to exercise supplemental jurisdiction over the state law claims under § 1367(c)(3).

This order disposes of Docket No. 32.  The Clerk of the Court is directed to enter a final judgment in accordance with the above and close the file in this case.

**IT IS SO ORDERED**.

Dated: August 31, 2021

_____
EDWARD M. CHEN
United States District Judge